## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHAD EVERETT RIDENOUR,                CASE NO. 2:20-cv-13272

     *Plaintiff*,                                HON. SEAN F. COX
*v.*                                                    DISTRICT JUDGE

COMISSIONER OF SOCIAL              HON. PATRICIA T. MORRIS
SECURITY,                                       MAGISTRATE JUDGE

     *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 15, 17, 19)

### I.    RECOMMENDATION

Plaintiff Chad Ridenour challenges the Commissioner of Social Security regarding a final decision denying his claim for supplemental security income ("SSI"). The case was referred to the undersigned for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B) (2012); E.D. Mich. LR 72.1(b)(3). For the reasons below, I recommend **GRANTING** Plaintiff's motion for summary judgment, (ECF No. 17), **DENYING** the Commissioner's motion, (ECF No. 19), and remanding the decision.

### II.    REPORT

#### A. Introduction and Procedural History

Plaintiff first filed an application for SSI and disability insurance benefits ("DIB") on April 17, 2015, alleging that he became disabled on December 1, 2009. (ECF No. 12, PageID.140.) Plaintiff was denied at the initial level and requested a hearing before an

administrative law judge ("ALJ").   (*Id.*)   On August 22, 2017, the ALJ determined that Plaintiff was not disabled.   (*Id.* at PageID.137, 152.) The Appeals Council denied Plaintiff's request for review on April 23, 2018.  (*Id.* at PageID.157, 161.)[1]

Plaintiff protectively filed another application for SSI, but not DIB, on July 5, 2018. (*Id.* at PageID.82, 177.)   He alleged that he became disabled on August 23, 2017.  (*Id.*) The Commissioner denied these claims on August 29, 2018.   (*Id.* at PageID.82, 176.) Plaintiff then requested a hearing before another ALJ, which occurred on November 12, 2019. (*Id.* at PageID.98.)  The ALJ issued a decision on December 18, 2019, finding that Plaintiff was not disabled.   (*Id.* at PageID.93.)   The Appeals Council denied review on October 16, 2020.  (*Id.* at PageID.60.)  Plaintiff sought judicial review on December 11, 2020.  (ECF No. 1.)  The parties filed cross-motions for summary judgment and briefing is complete.  (*See* ECF Nos. 15, 17, 19–20.)[2]

**B.  Standard of Review**

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g) (2012).  The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."

---

[1] Although not explicitly stated in the record, the Commissioner asserts that Plaintiff did not request judicial review after the Appeals Council denied his request for review on April 23, 2018.  (ECF No. 19, PageID.556.)   Rather, Plaintiff filed another application for benefits in July, 2018.   (ECF No. 12, PageID.177.)

[2] Plaintiff initially submitted a motion for summary judgment that contained incorrectly formatted record citations.   (*See* ECF No. 15.)   Upon realizing this mistake, Plaintiff submitted an amended motion for summary judgment that corrected this error.  (ECF No. 16.)  Both briefs are identical in all other respects. (*Compare* ECF No. 15, *with* ECF No. 17.)

*Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation marks omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Id*. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A) (2012).   The Commissioner's regulations provide that

disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4) (2021); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

534 (6th Cir. 2001).   "Through step four, the claimant bears the burden of proving the

existence and severity of limitations caused by [his or] her impairments and the fact that

[he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r*

*of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).   The claimant must provide evidence

establishing the residual functional capacity, which "is the most [the claimant] can still do

despite [his or her] limitations," and is measured using "all the relevant evidence in [the]

case record."   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (2021).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g) (2021)).

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 12, at PageID.93.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since "July 5, 2018, the application date." (*Id.* at PageID.84.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: narcolepsy, cataplexy, major depressive disorder, adjustment disorder, and anxiety. (*Id.* at PageID.84–85.) None of these impairments met or medically equaled a listed impairment at step three. (*Id.* at PageID.85–87.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 416.967(b) except the claimant can only frequently crouch, crawl, kneel, balance, stoop, and climb ramps and stairs but never climb ladders, ropes, or scaffolds. He cannot work around hazards such as unprotected height or unguarded, moving machinery. The claimant cannot operate a motor vehicle. He is able to understand, remember, and carry out simple instructions and make simple work-related decisions. The claimant will be off task ten percent of the [workday].

(*Id.* at PageID.87.) At step four, the ALJ found that Plaintiff could not perform his past relevant work as an automobile accessories installer or an automobile body repairer. (*Id.* at PageID.92.) Finally, at step five, the ALJ determined that Plaintiff could perform a

significant number of jobs in the national economy, including work as an office clerk, a cashier, and a bench assembler.  (*Id.* at PageID.92–93.)  Accordingly, the ALJ concluded that Plaintiff was not disabled.  (*Id.* at PageID.93.)

### E.  Administrative Record

#### i.      Medical Evidence

Plaintiff developed narcolepsy at forty-three years of age.  (*Id.* at PageID.106.)  Due to his narcolepsy, Plaintiff sleeps for "ten to [twelve] hours per day" and still "wakes up feeling unrefreshed."  (*Id.* at PageID.88.)  Plaintiff complains that he is seldom adequately rested and that this inhibits his ability to think, "process problems", concentrate, and "make good decisions."  (*Id.*)  Plaintiff also suffers from depression and anxiety, and reports that he is "short-tempered," often becoming "irritable and angry."  (*Id.*)

The state agency, non-examining psychologist, Doctor Joe DeLoach, opined that Plaintiff could perform unskilled work consisting of "simple tasks" performed "on a sustained basis."  (*Id.* at PageID.173.)  Doctor DeLoach explained that he adopted the prior ALJ's findings after determining that the record did not contain "new and material evidence" that Plaintiff's conditions had changed since the prior ALJ's decision.  (*Id.*)  However, although the prior ALJ did not find that Plaintiff had any social functional limitations, Doctor DeLoach opined that Plaintiff's social functioning was moderately impaired.  (*Id.* at PageID.145, 148, 173.)  Accordingly, Doctor DeLoach believed that Plaintiff "would likely need to work alone or in a job which requires no to minimal contact" with others.  (*Id.* at PageID.173.)

### ii.    Nonmedical Evidence

On August 17, 2018, Plaintiff completed a report detailing his daily activities. Plaintiff stated that he could not "stay awake for more than [five hours] at a time" and that he would "sleep between [ten] to [twelve hours]" per night.  (*Id.* at PageID.353.)  Each morning, Plaintiff would take his medication, shower, let his dogs out, and do his laundry. (*Id.* at PageID.354.)   Plaintiff stated that he could manage his "personal needs and grooming," but he could not prepare is own meals.  (*Id.* at PageID.354–55.)   Plaintiff mentioned that he could perform some chores, such as taking out the trash and doing his laundry, and he stated that he could "count change" and "use a checkbook."  (*Id.* at PageID.355–56.)  Plaintiff claimed that he had no hobbies, that he did not engage in any social activities, and that struggled to socialize with others due to his "short temper."  (*Id.* at PageID.357–58.)

Plaintiff's mother completed a similar form on August 2, 2018.  (*Id.* at PageID.328.) Unlike Plaintiff's report, she described Plaintiff as being social and relatively active.  For example, she stated that Plaintiff "spen[t] time with others" by playing video games, talking on the phone with friends, and riding his bicycle to the corner store.  (*Id.* at PageID.333.) Plaintiff would frequently visit his brother, his neighbor, and his friends each week.  (*Id.*) Plaintiff had one friend with whom he would regularly play guitar.  (*Id.*)  He also did some light chores around the house, such as washing the dishes, mowing the grass, vacuuming, taking out the trash, and feeding the family's cats.  (*Id.* at PageID.329–31.)

### iii.     Plaintiff's Testimony at the Administrative Hearing

The ALJ began the hearing by examining Plaintiff.  (*Id.* at PageID.105.)  Plaintiff explained that he inherited his narcolepsy from his mother when he was forty-three years old.  (*Id.* at PageID.106.)  Plaintiff worked his entire adult life, but as his narcolepsy progressed, he found that he could not "get through an eight hour shift . . . without falling asleep . . . ."  (*Id.* at PageID.107.)  He testified that he would sleep for ten hours, but he would still wake up feeling "exactly the same way" he "did when [he] went to sleep."  (*Id.*)  His narcolepsy impaired his ability to "process problems" or make "rational decisions."  (*Id.* at PageID.108.)  Plaintiff also suffered from cataplexy, which would cause him to lose muscular control whenever he felt any strong emotions.  (*Id.*)  However, Plaintiff's cataplexy was largely controlled by his medications.  (*Id.* at PageID.110.)

Plaintiff's symptoms worsened as he grew older.  While Plaintiff would sleep between eight to nine hours per night before 2017, at the time of the hearing, Plaintiff could sleep up to twelve hours per night and he would still take naps throughout the day.  (*Id.* at PageID.108–09.)

The ALJ then asked Plaintiff about his mental impairments.  Plaintiff suffered from depression, but although he did not participate in counseling, he took medication that alleviated his symptoms.  (*Id.* at PageID.110–11.)

Plaintiff lived with both of his parents and he testified that he would "try to help them out as much" as he could.  (*Id.* at PageID.111.)  For example, Plaintiff would take out the trash, clean, wash dishes, and cook on occasion.  (*Id.*)  Plaintiff socialized regularly

with his friends.  Plaintiff would often play guitar with one of his friends and he frequently rode his bike near his home for exercise.  (*Id.* at PageID.112–13.)

The ALJ then allowed Plaintiff's counsel to examine him.  Counsel began by asking Plaintiff about medications he took for his narcolepsy.  (*Id.* at PageID.113.)  Plaintiff testified that he took Modafinil, which simply gave him a three to four hour "window of being awake." (*Id.*)  Plaintiff could only take this medication once per day, and when he was not on the medication, he would experience spontaneous "sleep attack[s]." (*Id.* at PageID.113–14.)  These attacks would occur without warning and could last between one to ten hours.  (*Id.* at PageID.114.)

### i.      Plaintiff's Mother's Testimony at the Administrative Hearing

After Plaintiff testified, the ALJ then allowed Plaintiff's counsel to examine Plaintiff's mother.  (*Id.* at PageID.122.)  Like Plaintiff, she developed narcolepsy when she was about forty years old.  (*Id.* at PageID.122–23.)  She generally described Plaintiff's symptoms and testified that Plaintiff had lived independently for about twenty years before he developed narcolepsy.  (*Id.* at PageID.123–24.)  Plaintiff's counsel also asked her about Plaintiffs daily activities.  (*Id.* at PageID.128.)  Plaintiff's mother explained that Plaintiff was generally inactive, but that he did help around the house with small chores.  (*Id.* at PageID.128–29.)  Plaintiff would ride his bicycle around their neighborhood, but he would need to be driven by his parents whenever he wanted to travel a significant distance.  (*Id.* at PageID.129–30.)

ii.     **The Vocational Expert's Testimony at the Administrative Hearing**

The ALJ then questioned the vocational expert ("VE").  (*Id.* at PageID.131.)  The ALJ asked the VE to consider a hypothetical person with the same age, education, and past relevant work as Plaintiff, who could perform light work, except that he or she:

> could not climb ladders, ropes[,] or scaffolds[,] or work around hazards such as unprotected eights or unguarded moving machinery.  They could frequently kneel, crouch, stoop, balance, crawl[,] and climb ramps and stairs. The individual could not operate a motor vehicle.  They would be able to understand, carry out and remember simple instructions and make simple work-related decisions[,] and they would be off[-]task [ten] percent [of the workday].

(*Id.* at PageID.131–32.)   The VE testified that, consistent with the Dictionary of Occupational Titles ("DOT") and her own personal experience, this person could not perform Plaintiff's past relevant work, but that the person could perform several jobs that were available in the national economy.  (*Id.* at PageID.132–34.)  For example, this person could work as an office clerk, DOT code 239.567-010, light work, approximately 160,000 jobs; a cashier, DOT code 211.462-010, light work, approximately 280,000 jobs; and an assembler, DOT code 759.684-042, approximately 94,000 jobs.  (*Id.* at PageID.132.)

The ALJ then asked the VE to assume the same hypothetical except that the individual could stand or walk "for no more than two [hours] out of an" eight-hour workday.  (*Id.* at PageID.133.)  The VE testified that this hypothetical person could perform the same jobs, but that there would only be 140,000 cashier jobs available nationally and 80,000 office clerk jobs available nationally.  (*Id.*)

Last, the ALJ, asked the VE how long an individual could be off task during the workday and remain employed. (*Id.*)  The VE replied that an individual could be off task, "up to and including [ten] percent" of the workday.  (*Id.*)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B) (2012).  The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

   (i)    A licensed or certified psychologist at the independent practice level; or

   (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)    Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)    Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)    Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-

language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a) (2021).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.* § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings,

including those from your medical sources." *Id.* § 404.1520c(a).  "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.*  The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.*

Of these factors, the first is "supportability."  This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim.  This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]"  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]"  *Id.* § 404.1520c(c)(3).  This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.*   The fourth factor of the SSA's analysis is "specialization."   In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."   *Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."   These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."   *Id.* § 404.1520c(c)(5).   "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."   *Id.*   Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive."   *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements."   The ALJ will consider "source-level articulation."   Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record."   *Id.* § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate."   *Id.*   The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually."   *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be."   *Id.* § 404.1520c(b)(2).   As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.   We may, but are not required to, explain how we considered

the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

> (i)  Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

16

(ii)   Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)  Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)   Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)    Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)   Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.* § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.* § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable

clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.* § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and

persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.* § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.* § 404.1529(a).  The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

objective medical evidence and other evidence, will be taken into account . . . .  We will

consider all of the evidence presented, including information about your prior work record,

your statements about your symptoms, evidence submitted by your medical sources, and

observations by our employees and other persons[.]"  *Id.*  The regulations establish that

"[f]actors relevant to your symptoms, such as pain, which we will consider include []:

  (i)     [D]aily activities;

  (ii)    The location, duration, frequency, and intensity of . . . pain;

  (iii)   Precipitating and aggravating factors;

  (iv)    The type, dosage, effectiveness, and side effects of any medication . . .
          taken to alleviate . . . pain or other symptoms;

  (v)     Treatment, other than medication, . . . received for relief of . . . pain;

  (vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits,

you must follow treatment prescribed by your medical source(s) if this treatment is

expected to restore your ability to work."  *Id.* § 404.1530(a).  Stated differently, "[i]f you

do not follow the prescribed treatment without a good reason, we will not find you disabled

or, if you are already receiving benefits, we will stop paying you benefits."  *Id.*

§ 404.1530(b).  Acceptable (or "good") reasons for failure to follow prescribed treatment

include:

  (1)     The specific medical treatment is contrary to the established teaching
          and tenets of your religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.* § 404.1530(c).

### G. Arguments and Analysis

#### a. Substantial Evidence

Plaintiff first argues that the ALJ's RFC finding was not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ improperly discounted Doctor DeLoach's opinion that Plaintiff had "moderate" social limitations such that he "would likely need to work alone or in a job that requires no to minimal contact" with others. (ECF No. 12, PageID.173.) Additionally, Plaintiff argues that the ALJ failed to adequately explain his reasons for discounting Doctor DeLoach's opinion.

An ALJ must consider all medical opinions and explain how persuasive he or she found the opinions of each medical source. 20 C.F.R. § 416.920c(a)–(b)(1) (2021). An ALJ may not "defer or give any specific evidentiary weight, including controlling weight" to any medical source—it is the ALJ's responsibility to freely weigh each medical opinion. *Id.* When considering the persuasiveness of a medical opinion, an ALJ must consider (1) how well the opinion is supported by objective evidence and the medical source's

explanations, (2) the opinion's consistency with the entire record, (3) the source's "[r]elationship with the claimant," (4) the specialization of the medical source, and (5) any other factor that may "support or contradict" the medical opinion. *Id.* § 416.920c(c).

The regulations explain that "supportability" and "consistency" are the most important of these factors. *Id.* § 416.920c(b)(2). Accordingly, an ALJ need only discuss these two factors in his or her decision. *Id.* The ALJ's discussion must be sufficient to allow a reviewing court "to determine whether" the ALJ's decision "was supported by substantial evidence." *Hardy v. Comm'r of Soc. Sec.*, 20-10918, 2021 WL 3702170, at *4 (E.D. Mich. Aug. 13, 2021) (quotation marks mitted) (quoting *Vaughn v. Comm'r of Soc. Sec.*, No. 20-1119, 2021 WL 3056108, at *11 (W.D. Tenn. July 20, 2021)).

Here, although Doctor DeLoach opined that Plaintiff had moderate social limitations, the ALJ found that Plaintiff's ability to interact with others was, at most, mildly limited. (ECF No. 12, PageID.91.) This finding is supported by substantial evidence. First, as the ALJ noted, the prior ALJ did not find any functional limitations with respect to Plaintiff's ability to interact with others. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933 (6th Cir. 2018) ("[T]he first administrative law judge's findings are a legitimate, albeit not binding, consideration in reviewing a second application."). The ALJ also explained that while Doctor DeLoach's opinion was generally persuasive, his opinion on Plaintiff's ability to interact with others was unsupported and inconsistent with other evidence in the record. (ECF No. 12, PageID.91.) Indeed, Doctor DeLoach adopted all his findings from the prior ALJ's opinion after determining that the record did not contain new and material

evidence of a changed condition.  However, as the present ALJ noted, although Doctor DeLoach purported to adopt the prior ALJ's findings, the prior ALJ found no functional limitations regarding Plaintiff's ability to interact with others.  (ECF No. 12, PageID.145, 173, 175.)  Doctor DeLoach provided no explanation for why he departed from the prior ALJ's finding despite finding that he was bound by the prior ALJ's findings because the record contained no new and material evidence of a changed condition.[3]  (*Id.* at PageID.173); *see* 20 C.F.R. § 416.920c(b)(2), (c)(1) (requiring ALJs to explain how they considered a medical opinion's "supporting explanations").

Other evidence in the record supports the ALJ's finding that Plaintiff had no more than mild social limitations.  In his discussion of Doctor DeLoach's opinion, the ALJ stated summarily that "the current medical evidence does not support that the claimant has more than mild limitations interacting with others."  (ECF No. 12, PageID.91.)  While Plaintiff argues that this statement does not adequately explain the ALJ's rationale, the ALJ explicitly discussed factors supporting mild social limitations in other parts of his decision. *See Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (reasoning that an ALJ's cursory step three discussion was adequately explained by his step two discussion); *Gang v. Comm'r of Soc. Sec.*, No. 2:20-cv-3267, 2021 WL 2800709, at *11 (S.D. Ohio July 6, 2021) ("[A]lthough [the ALJ's] analysis may have been brief, when combined with her detailed discussion of . . . Plaintiff's spinal impairments, it provided sufficient articulation

---

[3] Both Doctor DeLoach and the prior ALJ found, at step three, that Plaintiff's ability to interact with others was moderately limited; however, unlike Doctor DeLoach, the prior ALJ did not include any restrictions in his RFC that would have accounted for Plaintiff's limited social abilities.  (*Id.*)

for adequate judicial review."). For example, at step three, the ALJ mentioned that Plaintiff admitted that he would "get[] together with friends" to "play[] guitar." (ECF No. 12, PageID.86, 111–12.) The ALJ also discussed how Plaintiff described having a healthy relationship with his family, mentioning that he would help with laundry, look after the family pets, help with household chores, take out the trash, do dishes, and sometimes cook meals. (*Id.* at PageID.86, 111, 354–355.)

When explaining Plaintiff's RFC, the ALJ again discussed several of Plaintiff's social activities. (*Id.* at PageID.90.) Specifically, Plaintiff "worked with his brother" in his brother's "shop" and often "rode his bicycle over to his brother's" home. (*Id.* at PageID.90, 329, 413.) The ALJ mentioned how Plaintiff's mother stated that Plaintiff would interact with others by "talking on the phone with his friends, playing video games, riding his bicycle to the corner store, and going to visit his friends twice a week." (*Id.* at PageID.90, 332–33.) The ALJ again discussed how Plaintiff would socialize with friends and help his family with household chores. (*Id.* at PageID.90.) Accordingly, the ALJ adequately articulated how Doctor DeLoach's opinion was inconsistent with other evidence in the record and his decision to discount Doctor DeLoach's opinion was supported by substantial evidence. *Cf. Gholston v. Comm'r of Soc. Sec. Admin.*, No. 1:15cv182, 2016 WL 1244806, at *4 (N.D. Ohio Mar. 30, 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)) ("[A]lthough the ALJ did not restate her discussion relating to the opinion of Dr. House in her RFC analysis, the Listing analysis was sufficient to demonstrate her interpretation Dr. House's opinion . . . .").

In rebuttal, Plaintiff argues that "there is no mention in the record that Plaintiff is not limited in social functioning or limited to only mild interactions." First, as discussed, the ALJ relied on substantial evidence in finding that Plaintiff had no functional limitations regarding his ability to interact with others. (*See* ECF No. 12, PageID.86, 90.) Second, it is Plaintiff, not the Commissioner, who carries the burden of proof. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999). Until step five, the Commissioner need not provide evidence that Plaintiff is not disabled—unless Plaintiff "provide[s]" enough "information about his medical condition" to prove that he is disabled, he is assumed to be capable of working. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Plaintiff also argues that the ALJ erred by adopting the prior ALJ's finding that Plaintiff had no social functional limitations. Specifically, Plaintiff argues that the prior ALJ's finding is not supported by substantial evidence because it too improperly discounted Doctor DeLoach's opinion that Plaintiff had moderate social limitations. First, notwithstanding the prior ALJ's finding, the record currently contains enough information for a reasonable person to conclude that Plaintiff had no social limitations—even if it also contains enough information for a reasonable mind to find that Plaintiff did have moderate social limitations. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The ALJ described numerous examples of Plaintiff interacting with friends and family on a regular basis. (ECF No. 12, PageID.86, 90.)

Second, neither the ALJ nor this Court, may retroactively assess a prior ALJ's decision. Indeed, 42 U.S.C. § 405(g) (2012) provides that a claimant must appeal a denial

of benefits to the district court within sixty days of receiving notice of the Commissioner's final decision—this window has long since passed, and this Court lacks jurisdiction to review the prior ALJ's decision.   Further, a prior ALJ's findings may be properly considered by a subsequent ALJ, regardless of their evidentiary support.   *Earley*, 893 F.3d at 933.   A prior ALJ's findings are only legitimate considerations for a subsequent ALJ because consideration of a prior *finding* promotes "[f]inality, efficiency, and the consistent treatment of cases."   *Earley*, 893 F.3d at 933.   These interests are advanced irrespective of how well supported the prior opinion may have been, and a requirement that an ALJ may only adopt prior ALJ findings that are supported by substantial evidence could put the district court in the awkward position of retroactively assessing prior ALJ decisions that are not properly before the court.   *See id.*; 42 U.S.C. § 405(g).

### b. Whether the ALJ Legally Erred by Adopting Findings from the Prior ALJ Decision

Plaintiff argues that the ALJ erred by adopting the previous ALJ's RFC findings, because the previous ALJ was not properly appointed under the Appointments Clause of the United States Constitution, and thus had no authority to render a decision.   Although the present ALJ was properly appointed, the present ALJ considered himself bound by collateral estoppel and adopted most of the previous ALJ's findings.   Thus, Plaintiff argues, this decision violated the appointments clause because most of the material findings were made by an improperly appointed ALJ.   Whatever the merits of this argument, I suggest that the present ALJ improperly applied collateral estoppel when he adopted the prior ALJ's RFC findings, and this case should be remanded on this narrower ground.   *See*

*Northwest Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 205–06 (2009) (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984)) ("It is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case . . . ."); *Hankins v. Light*, 441 F.3d 96, 111 (2d Cir. 2006) (Sotomayor, J., dissenting) (quoting *Brockett v. Spokane Arcades*, 472 U.S. 491, 501 (1985)).

Although federal courts should avoid constitutional issues where possible, federal courts may nonetheless consider a constitutional argument, made in the alternative to a non-constitutional argument, where the constitutional issue would provide a unique remedy that the other, non-constitutional ground for relief would not. *See Northwest Austin Mun. Utility Dist. No. One*, 557 U.S. at 213–14 (Thomas, J., concurring); *Cook County v. Wolf*, 498 F. Supp.3d 999, 1009 (N.D. Ill. 2020). Relying on *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018), Plaintiff argues that this is the case here. In *Lucia*, the Supreme Court held that the proper remedy for an Appointments Clause violation is a "new 'hearing before a properly appointed' official." *Id.* However, the *Lucia* Court added that this new official could not be the improperly appointed official who rendered the original decision, even if that official had since been properly appointed. *Id.* (quoting *Ryder v. United States*, 515 U.S. 177, 183, 188 (1995)). The Court reasoned that this official could not "be expected to consider the matter as though he had not adjudicated it before." *Id.* Thus, this remedy was "designed not only to" remedy the constitutional error, but also to incentivize Plaintiffs "to raise Appointments Clause challenges." *Id.* at 2055 n.5 (quotation marks omitted) (quoting *Ryder*, 515 U.S. at 183).

27

In Plaintiff's view, this holding extends not only to the previous ALJ, who was not properly appointed, but also to the current ALJ, who was properly appointed, but who adopted nearly all of the prior ALJ's findings, believing that he was precluded from relitigating these issues.  (ECF No. 17, PageID.534.)  The *Lucia* Court did not address this unique situation, and I suggest that its remedy does not preclude the most recent ALJ from rehearing this case on remand.  The *Lucia* Court was concerned that plaintiffs might forgo appointments clause challenges if the only remedy would be to relitigate their claims before the same official.  *See* 138 S. Ct. at 2055.  Such a challenge would normally prove futile because that official would almost certainly reach the same conclusions on remand.  *See id.*  This is not a concern under these facts.  The current ALJ did not "adjudicate" the matter in the same sense as the ALJ in *Lucia*.  Indeed, the current ALJ applied collateral estoppel and adopted all of the prior ALJ's findings except where he found "new and material" evidence of a changed condition.  (ECF No. 12, PageID.82); *see In Re Markowitz* 190 F.3d 455, 461 (6th Cir. 1999) ("[C]ollateral estoppel 'precludes relitigation of issues of fact or law actually litigated and decided in a prior action . . . .'").  On remand, the ALJ would be free to make whatever factual findings he believes are supported by substantial evidence. In other words, the ALJ would no longer defer to the prior, improperly appointed, ALJ's findings, but would instead make his own findings.  Assuming the current ALJ committed a constitutional error by adopting the prior ALJ's findings, this would provide a sufficient remedy.  *See Lucia* 138 S. Ct. at 2055.  Accordingly, Plaintiff's constitutional issue would afford him no greater remedies than the narrower issue raised by the Court, and the Court

should decline to hear Plaintiff's constitutional argument.  *See Northwest Austin Mun. Utility Dist. No. One*, 557 U.S. at 213–14 (Thomas, J., concurring).

### i.  Collateral Estoppel

Although the ALJ's RFC finding was supported by substantial evidence, the ALJ erred at both steps three and five by treating the prior ALJ's findings as binding absent "new and material evidence" of a changed condition.  (ECF No. 12, PageID.82.)  While the ALJ could have chosen to give deference to the prior ALJ's findings, he was not required to.  Indeed, if supported by substantial evidence, the ALJ could have disregarded the prior ALJ's findings completely when making his factual findings.  However, because the ALJ considered himself bound by the prior ALJ's findings, I suggest that he adopted the prior ALJ's findings without meaningfully considering any new evidence that supported a different conclusion.

Although this argument was not raised by Plaintiff, I suggest that the Court may properly raise the issue *sua sponte*.  This District has often recognized that "in Social Security cases, the failure to submit a particular legal argument is 'not a prerequisite to the Court[] reaching a decision on the merits[] or . . . finding, *sua sponte*, . . . grounds for reversal."  *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *11 n.2 (E.D. Mich. Sept. 25, 2013); *see also Morris v. Comm'r of Soc. Sec.*, No. 2:18-12090, 2019 WL 375572, at *13 (E.D. Mich. July 18, 2019) (collecting cases).  Indeed, in reviewing Plaintiff's arguments, the Court was required to "review the administrative record in some detail," and that review uncovered an "obvious and significant legal error."  *Trainor v. Comm'r of Soc. Sec.*, No. 13-10093, 2014 WL 988993, at *23 (E.D. Mich. Mar. 13, 2014);

*Andras v. Comm'r of Soc. Sec.*, No. 18-cv-10192, 2019 WL 1246253, at *4 n.2 (E.D. Mich. Feb. 11, 2019).

Relying on *Dennard v. Sec'y of Health & Hum. Servs.*, 907 F.2d 598 (6th Cir. 1990) and *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), the ALJ adopted all of the prior ALJ's findings after determining that the record contained no "new and material" evidence that Plaintiff's conditions had regressed.[4]  (*Id.* at PageID.82.)  However, both *Dennard* and *Drummond* were significantly narrowed in *Earley v. Comm'r of Soc. Sec.*, 893 F.3d at 931–34, and as a result, the ALJ applied the wrong legal standard which led him to err (1) at step three, and (2) when considering Plaintiff's RFC.[5]

In *Dennard*, the Sixth Circuit held that an ALJ was "precluded by estoppel" from reconsidering whether a claimant could perform his past relevant work after another ALJ, deciding an earlier application, determined that the claimant could perform his past relevant work.  907 F.2d at 600.  Subsequently, the Social Security Administration promulgated SSAR 98-3(6) which interpreted *Dennard* and instructed ALJs that they "must adopt" findings from earlier decisions, "unless there is new and material evidence relating" to the prior ALJ's finding.  SSAR 98-3(6), 1998 WL 28390, at *3.  The ruling applied even where

---

[4] The present ALJ made only one change to the previous ALJ's findings—apparently finding "new and material evidence," he added "cataplexy" to Plaintiff's list of severe impairments at step two.  (ECF No. 12, PageID.82, 84.)

[5] The ALJ's step one and step four determinations were favorable to Plaintiff and are not at issue.  *See Holdridge v. Comm'r of Soc. Sec.*, 351 F. Supp. 3d 316, 326 (W.D.N.Y. 2018).  Additionally, any error in the ALJ's step two finding would have been harmless because the ALJ was required to move on to the next step in the sequential evaluation process after finding just one severe impairment.  *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  Thus, any failure to find a severe impairment at step two "is . . . legally irrelevant," provided that the ALJ considered both "severe and non[-]severe impairments in the remaining steps of the sequential analysis." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Here, the ALJ found multiple severe impairments at step two and he "considered all [or Plaintiff's] symptoms" in subsequent steps.  (*See* ECF No. 12, PageID.84–93.)

a new application alleged disability during a timeframe that succeeded the earlier application. *See id.*

After *Dennard*, the Sixth Circuit decided *Drummond*, which, relying partially on Court's holding in *Dennard*, explicitly held that where an ALJ makes a final determination concerning a claimant's entitlement to benefits, all of the ALJ's *findings* are binding on the parties in all subsequent applications absent evidence of a "changed condition." 126 F.3d at 842. The *Drummond* Court reasoned that "principles of res judicata" and "collateral estoppel" prevent ALJs from challenging earlier findings, absent changed circumstances. *Id.* at 840–42.[6] In several unpublished decisions following *Drummond*, the Sixth Circuit applied this rule even where the new application concerned periods of time that were not addressed by the Administration's prior decision. *See, e.g.*, *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015); *Haun v. Comm'r of Soc. Sec.*, 107 F. App'x 462, 464 (6th Cir. 2004).

However, in *Earley*, the Sixth Circuit significantly restricted the scope of *Drummond* and *Dennard*. The Sixth Circuit explained that the *Drummond* Court "overstate[d]" how res judicata applied to subsequent applications. *Earley*, 893 F.3d at 933. The *Earley* Court held that while the *Drummond* Court was correct that "res judicata may apply to administrative proceedings," res judicata only prevented subsequent applications "for the same period of time," that was considered in the prior application. *Id.*

---

[6] The Social Security Administration promulgated SSAR 98-4(6), 1998 WL 283902 (June 1, 1998), interpreting *Drummond*, on the same day that it promulgated SSAR 98-3(6). The instructions in SSAR 98-4(6) are identical to those in SSAR 98-3(6).

Thus, ALJ's are not bound by prior findings when considering periods of disability that succeed the time period adjudicated in the earlier decision. *Id.* Indeed, because "human health is rarely static" an "earlier proceeding . . . could rarely, if ever, have 'actually litigated and resolved' whether a person was disabled at some later date." *Id.* Thus, ALJ's must "giv[e] a fresh look" to periods of disability that were not addressed in the prior ALJ's decision. *Id.* at 931, 934. Still, an ALJ at a later hearing need not "ignore" a prior ALJ's findings—"[a] later [ALJ] may" at least "consider what an earlier ALJ did . . . ." *Id.* at 934. An applicant whose "second filing mimics the first one" should "not have high expectations about success." *Id.* at 933.

Here, because the ALJ incorrectly evaluated the prior ALJ's finding under *Dennard* and *Drummond*, the ALJ did not adequately consider Plaintiff's condition after August 23, 2017, Plaintiff's new alleged onset date. (ECF No. 12, PageID.82.) By treating the prior ALJ's findings as controlling, the ALJ has not "giv[en] a fresh look" to Plaintiff's condition during the time after the prior ALJ's decision. *Earley*, 893 F.3d at 931. The prior ALJ rendered a decision August 22, 2017, and the record contains medical evidence as recent as September 2019—none of Plaintiff's medical evidence from this two-year period was considered by the prior ALJ. (ECF No. 12, PageID.59, 152.) Even though Plaintiff's present application alleged that his disability began on January 1, 2019, the ALJ here assumed that the prior ALJ's finding applied to a time period he had not considered, simply because the present ALJ lacked "new and material" evidence to support different factual findings. (ECF No. 12, PageID.82.) But this is the incorrect standard. As the *Earley* Court recognized, human health fluctuates and changes with age; therefore, the ALJ should have

looked freely at the record when evaluating Plaintiff's condition after August 2017, without holding any new evidence to a heightened standard.  893 F.3d at 933–34.

The ALJ's failure to give Plaintiff's new medical evidence a fresh look was a harmful error because the record may have contained substantial evidence supporting either a favorable step three determination or a more restrictive RFC.  For example, the ALJ, adopting the prior RFC findings, determined that Plaintiff would be off task for ten percent of the workday because of his narcolepsy.  (ECF No. 91, PageID.91.)  However, Plaintiff testified that his symptoms had regressed since his last application, that he was constantly tired, that he napped throughout the day, and that he would randomly experience "sleep attacks" that could last for hours.  (*Id.* at PageID.107–09, 113–14.)  These facts might support a finding that Plaintiff would be off task for more than ten percent of the workday, and according to the vocational expert, this finding would prevent Plaintiff from finding any work in the national economy.   (*Id.* at PageID.133.)  However, the current ALJ did not consider changing the prior ALJ's findings—once he found that Plaintiff's conditions had not materially changed, he simply applied collateral estoppel and adopted the prior ALJ's RFC.[7]  (*See* ECF No. 12, PageID.82–91.)

---

[7] Other courts have reasoned that even where an ALJ purports to follow *Drummond*, the ALJ has not erred if he or she has considered the new evidence.  *See, e.g.*, *Goins v. Saul*, No. 19-117, 2020 WL 1290784, at *6 (E.D. Ky. Mar. 18, 2020).  While I generally agree with this approach, I note that merely discussing the new evidence is not enough to show that it was considered.  The new ALJ must show that he or she is willing to depart from the prior ALJ's findings, such as by modifying the prior ALJ's RFC finding absent materially changed circumstances.  *See Alexander v. Berryhill*, No. 5:18-cv-163-GFVT, 2019 WL 2250631, at *5 (E.D. Ky. May 24, 2019); *Harrell v. Comm'r of Soc. Sec.*, No. 18-10698, 2020 WL 435229, at *7 (E.D. Mich. Jan. 28, 2020) (finding the ALJ's addition of new limitations to the RFC meant that he did not actually adopt the prior RFC, even though the language in the ALJ decision suggested he was required to do so).  *Contra Goins*, 2020 WL 1290784, at *6 ("Even if the evidence Goins points to could support a more limited RFC than that which ALJ Reynolds assigned, the Court must still affirm ALJ Reynolds's RFC determination, as it was based on substantial evidence.").  If an ALJ feels *bound* to default to prior findings,

To be clear, the current ALJ erred not because she credited the prior ALJ's finding, but because she treated it as binding. *See Earley*, 893 F.3d at 933. Even if Plaintiff's symptoms had not changed since his prior application, the ALJ could have completely ignored the prior ALJ's finding and assigned a different RFC if supported by substantial evidence. *See id.* The ALJ also could have properly found that there were no significant changes to Plaintiff's conditions, and, in the interest of "consistency," adopted the prior ALJ's findings after determining them to be persuasive. *See id.* at 931, 933–34. The bottom line is that the ALJ here should have freely considered the new evidence himself, instead of blindly deferring to the prior ALJ's findings. *See id.* Because the ALJ did the latter, Plaintiff was denied a fair consideration of his impairments. Therefore, I suggest remanding this case so that the ALJ can properly consider Plaintiff's application under *Earley*.[8] *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) ("[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow [the proper legal standards] and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'").

### H. Conclusion

then he or she has not actually given a fresh look to the new evidence, no matter how much the ALJ discusses the evidence in his or her decision. These discussions would merely be a façade, hiding a predetermined outcome. Thus, an ALJ who purports to be bound by *Drummond*, and complies with both *Drummond* and SSAR 98-4(6), cannot be said to have genuinely considered the new evidence even if the ALJ discusses them at length or adopts new findings. Therefore, the ALJ's extensive RFC discussion in this case, while supported by substantial evidence, does not comply with *Earley*.

[8] I suggest declining to award benefits here because "such a ruling 'is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking.'" *Id.* at 934–35. That is not the case here—applying the correct standard, the ALJ might still arrive at the same outcome. Therefore, remand is appropriate to correct this error.

For the previously discussed reasons, I recommend **GRANTING** Plaintiff's motion, (ECF No. 17), **DENYING** Defendant's motion, (ECF No. 19), and remanding the decision.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue

raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date: December 14, 2021                         S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge